**AMERICAN NATIONAL INSURANCE CO., Respondent,**

v.

**NOBLE COMMUNICATIONS CO., INC., Appellant.**

No. 20555.

Missouri Court of Appeals, Southern District, Division Two.

Nov. 1, 1996.

Richard E. Dorr, Timothy M. McDuffey, Dorr, Baird & Lightner, P.C., Springfield, for appellant.

Frank M. Evans, III, M. Scott Montgomery, Miller & Sanford, Springfield, for respondent.

PARRISH, Judge.

Noble Communications Co., Inc., (Lessee) appeals a judgment awarding damages to American National Insurance Co. (Lessor) for Lessee's breach of provisions of a lease agreement and denying Lessee's counterclaim for fraudulent misrepresentation.

Lessor brought an action to recover rent in accordance with a holdover provision in a lease (Count I), damages for unlawful detainer (Count II), cleaning expenses and damages to the leased premises (Count III) and attorney fees (Count IV). Lessee counterclaimed requesting damages for fraudulent misrepresentation. The trial court awarded summary judgment to Lessor on Count I and dismissed Count II. Following trial, the trial court found in favor of Lessee on Count III; in favor of Lessor on Count IV; and in favor of Lessor on Lessee's counterclaim. This court affirms the judgment as hereafter modified with respect to attorney fees, and remands.[1]

Lessor owns commercial rental property in Springfield, Missouri, known as Corporate Centre. On June 1, 1988, Lessor and Lessee entered into a lease agreement whereby Lessee would occupy a portion of Corporate Centre. The lease was for a six-year term, expiring July 31, 1994. It covered approximately 37,000 square feet of Corporate Centre.

---

1. Lessor has filed a motion with this court for attorney fees on appeal. That motion is ad- dressed, *infra*.

In early 1993 Lessee's representative, Michael Cooper,[2] and Tom McLoud, the manager and leasing agent of Corporate Centre, discussed an extension of the lease. McLoud submitted two written proposals, one in a letter dated January 18, 1993, and one in a letter dated January 29, 1993, for a ten-year extension. Those letters were followed by one dated March 3, 1993, in which McLoud acknowledged that Lessee was considering alternatives to a ten-year extension of its Corporate Centre lease. McLoud's letter advised Cooper he had inquired about Lessor's interest in granting Lessee a short-term extension; that Lessor's position was "that no leases be extended for less than a period of three years."

On June 16, 1993, Cooper wrote McLoud. He thanked McLoud for his patience in awaiting a response to the previous proposal and stated that Lessee had postponed its building plans and wanted to negotiate a workable solution to its space needs with Lessor. Lessee proposed a one-year extension with options for two additional one-year extensions and two additional five-year extensions.

McLoud replied by letter dated June 21, 1993. He acknowledged receipt of Lessee's June 16 proposal and advised Cooper that Lessor did not find it acceptable. McLoud again advised Cooper that Lessor did not desire granting an extension of the lease for a period less than three years.

There were no further negotiations between the parties until the following year. Mr. Cooper explained that there was "a down time" from June 1993 until early 1994. He testified, "We were looking at other options. We were looking at what we could do, but there were no negotiations between American National and Noble."

Cooper sent a letter to McLoud dated March 4, 1994. It stated that Lessee was not interested in extending its "commitment in Corporate Centre" for an additional three years, suggesting that a lease be negotiated "for a shorter period of time." The March 4 letter proposed terms for "[a] one (1) year or

eighteen (18) month lease" with options for additional extensions. The letter concluded, "We would be interested in reducing our space by about 5,000 square feet to allow you the opportunity to lease at a higher rate to a smaller tenant."

McLoud responded by letter dated March 14, 1994, and a proposed "Amendment to Lease." The letter was addressed to Cooper as Chief Financial Officer of Lessee. It explained:

Pursuant to our recent phone conversations and your letter, please find enclosed four copies of an Amendment to Lease setting forth the fact that you will extend your lease for a period of 18 months at a rate which you suggested in your letter. Please note that American National is not willing to take back 5,000 feet this time nor enter into any option agreements, but simply an 18 month extension.

. . . . .

Although the executive committee has not approved the lease, the real estate manager is willing to recommend this to them and will need signed copies of the amendment to take before the committee. If you will please have all four copies of the Amendment to Lease signed and returned to me, I will get them to Galveston for consideration.

Cooper responded to the March 14 correspondence and the proposed Amendment to Lease by letter to McLoud dated March 25, 1994, stating:

The term of 18 months and the rate are acceptable. However, we are strong in our position of having you take back 5,000 square feet of space. Our departments have been consolidated and therefore now, and will in the future, require less space. Tom, please let me know if this is acceptable.

McLoud replied by letter dated March 30, 1994. He advised Cooper that he had reviewed Cooper's response with Lessor; that since the proposed extension was for a short

---

2. Cooper identified himself in correspondence directed to McLoud as "Chief Financial Officer" of Lessee.

term with no increase in rent, Lessor was "unwilling to take back any square footage." The March 30 letter stated, "[Lessor] would be most happy to work with you on this arrangement if there were a longer term commitment on your company's behalf."

Cooper and McLoud had additional telephone conversations after Cooper received the March 30 letter. Their discussions included the possibility of having a longer term lease together with a 5,000 square foot reduction in space. Cooper was asked at trial, "When you prioritized what your priorities were on a new lease, what was the most important thing to you?" He answered, "We really wanted space taken back. Our business had changed dramatically. We had consolidated some departments, and we wanted some space taken back."

McLoud followed up his conversations with a letter to Cooper dated April 25, 1994. It stated:

> Please be advised that in my most recent conversations with American National, they will agree to allow you to reduce your space by approximately 4–5,000 square feet. Under the following terms and conditions:
>
> 1. The size and location of the space to be mutually agreed upon.
> 2. You extend the term of your lease for a period of three (3) years.
> 3. The rental rate for the remaining square footage will be $13.94 per square foot as stipulated in the amendment dated March 14, 1994.
>
> . . . . .
>
> If you find this acceptable, please let me know as soon as possible, as American National is getting very anxious to get your lease extended or see what we can do in terms of finding alternate tenants.

Shortly after receiving the April 25 letter—"probably within the next week"—Cooper delivered the four copies of the proposed lease dated March 14, 1994, that provided for an eighteen-month extension, signed by him on behalf of Lessee, to McLoud's office. He received a letter dated June 3, 1994, from McLoud stating:

> Since I have been unable to catch you by telephone, I thought I would let you know that I have discussed the latest proposal that you forwarded me to extend your lease for a period of eighteen (18) months upon the same terms and conditions as your existing lease.
>
> As you know, American National's position from the very beginning has been that they wanted a three (3) year lease term, and have accordingly denied the eighteen (18) month lease extension. They have asked that I sit down with you and see what we can resolve on a three (3) year extension. In light of the fact that your lease expires on August 1, 1994, we need to do this as soon as you have time.

After receiving the June 3 letter, Lessee searched for other property to rent. Lessee also continued negotiations with Lessor.

Lessor's real estate manager, Scott F. Brast, notified Cooper by letter dated June 22, 1994:

> As you are aware, the lease term between Noble Communications and American National Insurance Company expires July 31, 1994. As you are also aware, there has been no agreement reached between Noble Communications and American National to either extend the existing lease or to enter into a new lease.
>
> Please be advised that in the event the lease term expires without a written agreement being signed on behalf of American National to either extend the existing lease or to enter into a new lease, it is the intention of American National to enforce the terms of the existing lease. This will include but not be limited to collection of rent at 200% of the Base Rent under the existing lease during any holdover period.
>
> As you have been advised, American National is not willing to consider any extension of the existing lease for a term that is shorter than three years. I will look forward to hearing from you in this regard at your earliest convenience.

The June 22 letter from Lessor's real estate manager shows copies sent to McLoud and to Lessee's attorney.

Lessee's attorney then wrote to Lessor's real estate manager. The letter was dated June 30, 1996. It stated Lessee's understanding to be that Lessee had "accepted the 18 month lease extension that was negotiated and prepared by [Lessor's] local managing agent Tom McLoud." Lessee's attorney requested that Lessor "confirm this extension." The letter added, "If for any reason you are denying this extension, please advise me immediately of your reasons for doing so."

Lessor's attorney replied by letter dated July 8, 1994. The reply stated that Lessee's June 30 letter had been received by Lessor's real estate manager July 5, 1994. It gave the following response to the inquiries made by that letter:

There has been no agreement entered into between Noble Communications and American National to either extend the existing lease or to enter into a new lease. This fact has been pointed out repeatedly to your client and there is no reasonable basis for Noble Communications to have any other understanding of the circumstances regarding its lease.

As your client has been advised, American National is not willing to consider any extension of the existing lease for a term that is shorter than three years. If you wish to discuss an arrangement on that basis please let me know immediately. Otherwise, it is the intention of American National to enforce the terms of the existing lease. This would include but not be limited to collection of rent at 200% of the Base Rent under the existing lease during any holdover period past July 31, 1994.

Negotiations continued. A written proposal dated July 15, 1994, was submitted to Cooper. The letter concluded with the admonishments:

This proposal must be accepted by both parties on or prior to July 31, 1994, or said proposal will be withdrawn for consideration.

As always, this proposal does not constitute a legally binding agreement and is subject to a fully executed amendment between both parties.

Cooper responded by letter dated July 19, 1994. He stated that since Lessor was unwilling to enter into an agreement for less than three years, he was willing to proceed with negotiations for a lease for that period, adding, "However, until a new agreement is executed, I reserve the right to pursue legal remedies in regard to the eighteen month period." The letter continued by stating the last offer fell short of Lessee's requirements and itemized Lessee's needs.

Cooper and McLoud continued to exchange letters without Lessor and Lessee reaching an agreement. The final letter from McLoud was dated July 22, 1994. After itemizing the proposed terms, the letter stated:

This proposal constitutes the best and final offer that the owner is willing to consider. We feel that this is a fair and equitable proposal and has taken into account your requests and priority of your concerns. We hope that you will find this acceptable and remain a tenant at Corporate Centre.

Cooper replied by letter dated July 26, 1994, suggesting the owners had not bargained in good faith, concluding:

We do not accept your "best and final offer". You and the owners leave us with no other option other than to pursue alternative remedies. You are hereby advised that we do not intend to renew this lease. We will move out just as soon a [sic] possible. Obviously, under the circumstances you have left us in, we need a reasonable time to make these arrangements. I believe a period of four (4) months should be sufficient.

The lease pursuant to which Lessee occupied space in Corporate Centre included the provisions:

SECTION 20. ATTORNEY'S FEES. In the event Lessor or Lessee default in the performance of any of the terms, covenants, agreements or conditions contained in this Agreement and the other party hereto places the enforcement of this Agreement, or any part thereof, or the collection of any rent or any other charges due, or to become due hereunder, or recovery of the possession of the Leased Premises in the hands of an attorney, or files

suit upon the same, it is agreed that the defaulting party shall pay the reasonable attorney's fees incurred by the party not in default.

. . . . .

*SECTION 25. HOLDING OVER.* Upon the termination of this Agreement for any reason, Lessor shall have the right to reenter and resume possession of the Leased Premises. If Lessee should remain in possession of the Leased Premises after the termination of this Agreement without the execution by Lessor and Lessee of a new Lease Agreement, then Lessee shall be deemed to be occupying the Leased Premises as a tenant-at-sufferance subject to all the covenants of this Agreement except the amount of Base Rent, and the Base Rent for any such holdover period shall be 200% of the Base Rent being paid by Lessee immediately prior to the termination date, and Lessee shall indemnify Lessor and hold Lessor harmless from any claims which may be asserted by any third party who is unable to enter or occupy the Leased Premises because of Lessee's holdover occupancy thereof.

On August 1, 1994, Lessor received a rental payment from Lessee of an amount less than that specified by the "HOLDING OVER" provision of Section 25 of the lease. By letter dated August 2, 1994, Lessor demanded possession of the leased premises. On August 5, 1994, Lessor brought its action against Lessee. Lessee remained in the premises until September 15, 1994.

Lessee filed a counterclaim in which it alleged Lessor fraudulently misrepresented "that an eighteen (18) month lease was a viable option." Lessee sought damages for being required to move to temporary office space and for expenses incurred in "expediting preparation" of that space.

The trial court awarded Lessor damages on Count I for rent in the amount of $62,336.88 plus interest at the rate of 9% per annum from and after September 15, 1994,

and damages on Count IV for attorney fees in the amount of $4,500.00.

Lessee asserts four claims of trial court error. Points I and II are directed to the summary judgment entered as to Count I. Point III is directed to the award of attorney fees in Count IV, and Point IV is directed to the denial of Lessee's counterclaim.

■ Point I suggests the trial court erred in granting Lessor's motion for summary judgment as to Count I because the motion did not address facts showing nonexistence of the affirmative defenses of novation and equitable estoppel pleaded by Lessee. This court perceives the point to be a claim that, procedurally, the trial court erred in considering the motion for summary judgment because the motion, on its face, did not address affirmative defenses raised by Lessee.[3] The argument portion of Lessee's brief in support of Point I suggests:

> [Lessor's] Motion for Summary Judgment merely recited that the original lease was to terminate on July 31, 1994, and that [Lessee] stayed in possession until September 15, 1994. The motion did not put forth any facts which would have shown the nonexistence of some fact essential to establish the affirmative defenses put forth by [Lessee]. [Page references to Record on Appeal omitted.]

■ When a non-movant party pleads an affirmative defense, the party seeking summary judgment must show more than the elements of its claim to establish a right to summary judgment as a matter of law. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 383 (Mo. banc 1993). The party seeking summary judgment "must also show, beyond any genuine dispute, the nonexistence of some fact essential to the affirmative defense put forward by the non-moving party or that the defense is legally insufficient." *Id.*

Paragraphs 9 and 10 of Lessee's "Answer to Amended Petition" affirmatively alleged:

> 9. Plaintiff [i.e. Lessor] has waived any rights it may have had to enforce the

---

3. Arguably, Lessee waived this issue at oral argument. Lessee's attorney stated that all the evidence relative to Lessee's affirmative defenses was included in the record on appeal and requested that the issues presented with respect to Count I be decided on their merits.

termination date of said lease agreement or collect double rent in that Plaintiff agreed to an Amendment to the Lease Agreement dated March 14, 1994, which provided for an eighteen (18) month lease extension and constituted a novation of the existing agreement.

10. Plaintiff is estopped from enforcing the termination date of said Lease Agreement or collecting double rent in that Plaintiff made misrepresentations and failed to negotiate in good faith in regard to the extension of said lease such that it was impossible for Defendant [i.e. Lessee] to obtain alternative office space before August 1, 1994.

■ Lessee addressed the affirmative defenses of novation and estoppel in its memorandum in opposition to Lessor's motion for summary judgment. Lessor responded in its written reply by asserting the statute of frauds applied to the defenses of novation and estoppel and provided the trial court with authority on which it relied. Lessor further provided, as part of its reply, copies of correspondence between McLoud and Cooper and Brast and Cooper relative to the negotiations.

The trial court had before it Lessor's contention that the affirmative defenses of novation and estoppel were legally insufficient. The pleadings and documentation permitted the trial court to address the issues on the merits. Point I is denied.

Point II claims the trial court committed error in granting summary judgment on Count I "and by later failing to reverse said judgment at trial." Point II asserts the trial court erred (a) in failing to find a novation by reason that the parties "entered into a new, eighteen month lease contract which supplanted the original lease agreement," and (b) in failing to find that Lessor was "estopped from enforcing the termination date under the original lease agreement because of [Lessor's] misrepresentations and failure to negotiate in good faith concerning an ex-

tension of the lease term which resulted in [Lessee] being forced to continue in the lease premises until September 15, 1994."

■ "When considering appeals from summary judgments, the Court will review the record in the light most favorable to the party against whom judgment was entered." *ITT Commercial Finance Corp.*, 854 S.W.2d at 376. The non-movant is afforded the benefit of all reasonable inferences from the record. *Id.* Appellate review is essentially *de novo. Id.*

■ The first issue raised in Point II is whether the trial court erred in not finding a novation. To establish a novation, a party must prove: (1) a prior valid obligation; (2) agreement of all parties to a new contract; (3) extinguishment of the old contract; and (4) the validity of the new contract. *Spencer v. Millstone Marina, Inc.*, 890 S.W.2d 673, 676 (Mo.App.1994). A novation is subject to the same rules as any other contract. *Id.*

McLoud's March 14, 1994, letter to Cooper explained that the Amendment to Lease would be presented to Lessor upon its being signed by Lessee; that Lessor's real estate manager was willing to recommend that Lessor enter into that agreement with Lessee. Lessee was specifically advised that upon signing and returning the copies of the Amendment to Lease, the document would be sent to Lessor "for consideration."

■ "The essential elements of an enforceable contract are parties competent to contract, a proper subject matter, legal consideration, mutuality of agreement, and mutuality of obligation." *L.B. v. State Committee of Psychologists*, 912 S.W.2d 611, 617 (Mo.App.1995). In view of the qualifications expressed in McLoud's March 14 letter, it is unlikely that transmittal by McLoud to Cooper of the draft Amendment to Lease could be deemed an offer to lease the premises for the extended term set forth in the draft agreement.[4] Regardless, even if an offer had

---

4. This court does not hold that McLoud's transmittal of the draft "Amendment to Lease" constituted an offer by Lessor to extend the terms of the original lease for eighteen months. It is not necessary to address the issue of whether an

offer was made. *See,* however, *L.B. v. State Committee of Psychologists*, 912 S.W.2d at 619, regarding circumstances similar to those in this case.

been made, there was never mutuality of agreement.

 Mutuality of agreement does not exist unless there is a mutuality of assent by the parties to proposed terms for a contract. *Id.* When terms proposed as the basis for a contract are not accepted as presented or with certainty, there is no mutuality of agreement. *Gateway Exteriors v. Suntide Homes,* 882 S.W.2d 275, 279 (Mo.App.1994). If essential terms are reserved for future determination, the parties have not assented to the proposed terms and no contract is formed. *Id.*

The terms set forth in the proposed Amendment to Lease provided an eighteen-month extension on the entire premises Lessee was occupying. McLoud's letter stated, "Please note that American National is not willing to take back 5,000 feet this time...." Lessee responded, "The term of 18 months and the rate are acceptable. However, we are strong in our position of having you take back 5,000 square feet of space."

 If the tender of the draft Amendment to Lease was an offer, it was not accepted. Lessee rejected it by altering its terms. *L.B. v. State Committee of Psychologists,* 912 S.W.2d at 618; *see also, Lux v. Lewis,* 213 S.W.2d 315, 319–20 (Mo.1948). "[A]n acceptance which introduces new or variant terms from the offer amounts to a counter-proposition and rejection of the offer, which becomes open again only when renewed by the offeror." *Coffman Industries, Inc. v. Gorman–Taber Co.,* 521 S.W.2d 763, 773 (Mo.App.1975). Lessee's subsequent execution of the Amendment to Lease is of no consequence. No new contract was formed. The trial court's finding that there was no novation is not erroneous.

Lessee's second contention in Point II is that the trial court erred in not finding Lessor was estopped from enforcing the termination date of the lease because of misrepresentation and failure to negotiate in good faith concerning an extension of the lease. Lessee bases that claim on equitable estoppel.

 The applicability of equitable estoppel or estoppel *in pais* is explained in *Peer-*

*less Supply Co. v. Industrial Plumbing & Heating Co.,* 460 S.W.2d 651 (Mo.1970):

> [T]hree things must occur: first, an admission, statement or act inconsistent with a claim afterwards asserted and sued upon; second, action by the other party on the faith of such admission, statement or act; and third, injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement or act.

*Id.* at 666.

Lessee contends, "The inconsistent statement which now supports the application of equitable estoppel is the representation by [Lessor] in March that an eighteen-month lease extension as set forth in the Amendment to Lease was a viable option available to [Lessee]." Lessee contends it relied on representations by Lessor that an eighteen-month lease extension was available; that, based on that representation, it refrained from looking for other space to lease. As to its claim of injury, Lessee states, "[Lessee] lost at least three months time during which it would have looked for alternative office space. [Lessee] required an additional forty-five days beyond the end of the original lease term to complete the preparation and move to alternative space."

 In addition to contesting the merits of Lessee's claim, Lessor argues Lessee is barred from asserting a defense of equitable estoppel by the statute of frauds. That issue has not been addressed in Missouri, although similar claims with respect to the defense of promissory estoppel were rejected in *Resnik v. Blue Cross and Blue Shield of Missouri,* 912 S.W.2d 567, 573 (Mo.App.1995); and *Davis v. Nelson,* 880 S.W.2d 658, 666 (Mo. App.1994). *Resnik* and *Davis* hold that promissory estoppel is a recognized exception to statute of frauds requirements. Arguably, the same rationale for recognizing promissory estoppel as an exception to statute of frauds exists with respect to equitable estoppel. However, it is not necessary to address that issue in this case. The facts of this case would not support a defense of equitable estoppel.

The doctrine of equitable estoppel is not a favorite of the law and will not be applied lightly. *State ex rel. Sprouse v. Carroll County Comm'n,* 889 S.W.2d 907, 911 (Mo. App.1994). It can only be used when each element clearly appears, and the burden of proof is upon the party asserting it to establish the essential facts by clear and satisfactory evidence. *Lake St. Louis [Community Association v. Ravenwood Properties, Ltd.],* 746 S.W.2d [642] at 646 [ (Mo.App.1988) ].

*Farmland Industries, Inc. v. Bittner,* 920 S.W.2d 581, 583 (Mo.App.1996).

Lessee did not establish by clear and satisfactory evidence that Lessor represented an eighteen-month lease extension would be available to Lessee. Lessee failed to prove the first element necessary to show equitable estoppel—that Lessor made a statement inconsistent with its later actions.

In March 1994, McLoud discussed Lessee's desire for an eighteen-month extension with Cooper. McLoud's March 14 letter transmitted a draft lease extension which outlined conditions that McLoud stated he would recommend to Lessor if Lessee found them acceptable. McLoud's letter explained that Lessor's real estate committee would have to approve those terms if Lessee sought to go forward with the proposal. Lessee chose not to go forward because Lessee was unwilling to continue renting all the space it was then occupying.

Lessee sought a reduction in space of approximately 5,000 square feet. Negotiations for an eighteen-month extension ceased at that point. McLoud told Cooper in his March 30 letter, "[Lessor] would be most happy to work with you on this arrangement if there were a longer term commitment on your company's behalf." Negotiations after that time were directed to a three-year extension. The statement in McLoud's June 3 letter, "As you know, [Lessor's] position from the very beginning has been that they wanted a three (3) year lease term, and have accordingly denied the eighteen (18) month lease extension," was not inconsistent with prior dealings between the parties.

Lessee's failure to acquire alternative space was the result of the course of action it chose to follow for whatever reason. It was not the product of actions or statements of Lessor inconsistent with the claim it brought for rent based on the holdover provision of its lease. The trial court's finding that Lessee failed to prove equitable estoppel is not erroneous. Point II is denied.

Point III is directed to the attorney fees awarded Lessor based on the provision in the lease requiring "the defaulting party" to pay the other party's attorney fees in the event of default. Point III asserts, "[I]f this court finds the judgment on Count I should be reversed there will be no remaining finding that [Lessee] breached the original lease agreement and, therefore, there will be no basis for an award of attorney fees." This court did not reverse the trial court's judgment with respect to Count I. Point III is moot.

Point IV asserts the trial court erred in finding for Lessor on Lessee's counterclaim for fraudulent misrepresentation "in that [Lessor] deliberately made misleading statements and took actions which caused [Lessee] to believe that an extension of the original lease for an additional eighteen month period was an acceptable alternative when, in fact, [Lessor] had no intention of agreeing to an eighteen-month lease extension."

The elements of a claim of fraudulent misrepresentation are: (1) a false, material representation; (2) the speaker's knowledge of its falsity or his ignorance of the truth; (3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated; (4) the hearer's ignorance of the falsity of the representation; (5) the hearer's reliance on its truth; (6) the hearer's right to rely thereon; and (7) the hearer's consequent and proximately caused injury. *Dierker Associates v. Gillis,* 859 S.W.2d 737, 746–47[22] (Mo.App.E.D.1993). A failure to establish any one of these elements with substantial evidence is fatal to recovery. *Scott [v. Car City Motor Co., Inc.],* 847 S.W.2d [861] at 864 [ (Mo.App.1992) ].

*Thoroughbred Ford, Inc. v. Ford Motor Co.,* 908 S.W.2d 719, 731 (Mo.App.1995).

■ What Lessee contends were false, material representations were the same statements it asserted as a basis for its affirmative defense of equitable estoppel discussed with respect to Point II. Point IV is denied for the reasons discussed in Point II.

In addition to the issues addressed in the briefs, Lessor has requested, by motion filed in this court, that it be awarded additional attorney fees for this appeal. Lessee filed no response in opposition to Lessor's motion. The motion was taken with the case.

■ Attorney fees may be awarded on appeal if they are based on a written agreement that is the subject of the issues presented in the appeal. *See Ashland Oil, Inc. v. Warmann,* 869 S.W.2d 910, 913 (Mo.App. 1994); *Wooten v. DeMean,* 788 S.W.2d 522, 529 (Mo.App.1990); *Tull v. Housing Authority of City of Columbia,* 691 S.W.2d 940, 943–44 (Mo.App.1985).

As previously noted, Section 20 of the lease that is the basis of this appeal provides if a party to the lease defaults in the performance of its terms and the other party places the agreement "in the hands of an attorney, or files suit upon the same," the defaulting party is liable for reasonable attorney fees incurred by the party not in default. Lessor is entitled to reasonable attorney fees for time its attorneys expended in addressing the issues related to the lease that were appealed. Lessor's Motion for Attorneys' Fees on Appeal is granted.

■ Lessor's motion states that the fees for time expended on the appeal amount to $5,179.48. Neither the motion, nor the itemization of expenses attached to it, differentiates between time expended in the appeal of the trial court's resolution of issues related to the lease and the time expended in the appeal of the trial court's resolution of Lessee's counterclaim for fraudulent misrepresentation. Lessor is entitled to reimbursement for attorney fees with respect to the former but not the latter. This court could remand this issue for determination by the trial court. However, it is not required to do so. *See Ashland Oil, Inc., supra; Wooten, supra;* and *Tull, supra.*

This litigation should end. This court concludes that the amount of $4,000 is a reasonable fee for handling the appeal of the issues relative to the lease in question. The judgment of the trial court with respect to Count IV is amended to increase the amount of attorney fees awarded Lessor from $4,500 to $8,500.

The judgment is affirmed as modified with respect to attorney fees. The case is remanded for entry of judgment reflecting that modification.

CROW, P.J., concurs.

SHRUM, J., concurs in separate opinion filed.

SHRUM, Judge, concurring.

I concur in J. Parrish's opinion. However, as to Lessee's first point, I would emphasize that Lessee did waive this issue at oral argument lest we leave the impression that merely addressing affirmative defenses in a memorandum in support of or in opposition to a motion for summary judgment is sufficient to dispel them. This is especially true for the defense of equitable estoppel as it is largely factually based. As this court has observed:

> " 'No definition of estoppel, however, can be completely satisfactory. An equitable estoppel rests largely on the facts and circumstances of the particular case[;] thus any attempted definition usually amounts to no more than a declaration of an estoppel under those facts and circumstances.' "

*Heitz v. Champagne,* 839 S.W.2d 700, 703 (Mo.App.1992) (quoting *Miskimen v. Kansas City Star Co.,* 684 S.W.2d 394, 400[7] (Mo. App.1984)). Memorandums in support or in opposition to summary judgment motions are not admissible evidence. It is "[o]nly materials that are admissible or usable at trial [that] can sustain or avoid a summary judgment." *American Family Mut. Ins. Co. v. Lacy,* 825 S.W.2d 306, 311[3] (Mo.App.1991).

The following occurred at oral argument in this case:

> [By Lessee's attorney]: "The affirmative defenses really didn't get considered as such in the trial court. But all the evi-

dence was put in and this is de novo review so I submit to you … the facts did come in on our counterclaim, they're in the court's file and a decision can be made by this court to handle these issues."

. . . . .

[By J. Shrum] "Are you suggesting then that any evidence you may have had on the defense of equitable estoppel is in the record? In other words, if this court should determine—and I'm not suggesting any outcome—but if we should determine that equitable estoppel was a viable defense, you're saying that was all there for the court to consider."

[Lessee's attorney] "We have no additional evidence that could be put in. So to send us back—we wouldn't have anything new to add."

By the foregoing colloquy, Lessee conclusively waived its claim of error in Point I. I would dispose of Point I on that basis alone. I concur in J. Parrish's analysis and disposition of Lessee's other points relied on.